IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

NORMAN NAPOLEON HAYES,

Plaintiff,

vs. CASE NO. 1:14-cv-34-WS-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

Defendant.

_____________________________/

**REPORT AND RECOMMENDATION**

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income (SSI). Doc. 1. The Commissioner has answered, Doc. 8, and both parties have filed briefs outlining their respective positions. Docs. 11, 12. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff applied for Supplemental Security Income on July 18, 2011, alleging disability since July 13, 2011. (R. 148-154.) His application was denied initially and upon reconsideration. (R. 67; 78.) At Plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on December 11, 2012. The ALJ denied Plaintiff's claim in a decision dated January 11, 2013, finding that although Plaintiff suffered from the severe impairments of personality disorder and hypertension, he was not disabled. (R. 19-29.) The Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision the Commissioner's final decision. (R. 1-4.)

On March 13, 2014, Plaintiff filed the instant appeal to this Court. Doc. 1. On appeal, Plaintiff raises the following issue: whether the ALJ erred by failing to give "great weight" to consulting psychologist Dr. Beaty. Doc. 11.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[8] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[9] The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

---

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] *See id.*

## III. SUMMARY OF THE RECORD

### A. Medical Record Evidence

Because Plaintiff's appeal focuses on his alleged mental health impairments and the opinion of Dr. Beaty, the Court's summary of his medical records will focus on these issues.

William E. Beaty, Ph.D., saw Plaintiff for a consultative examination on August 13, 2011. Dr. Beaty noted that Plaintiff's hygiene was adequate and he appeared casually groomed and dressed. Dr. Beaty noted that Plaintiff reported that he became angry quickly, and was taking an anger management class. Plaintiff reported that he had been accused of having an attitude and not fitting in. Plaintiff stated that he preferred solitude. Dr. Beaty observed that Plaintiff's interactions were socially appropriate though somewhat distant, he responded to questions appropriately, and maintained good eye contact. In assessing Plaintiff's ability to do work-related tasks, Dr. Beaty opined that Plaintiff's "speaking, traveling - all ok; understanding - ok." He noted that Plaintiff had some problems with recalling appointments because his mind tended to wander. (R. 289-91.)

Plaintiff had an initial psychological evaluation on November 7, 2011, with Dr. Gedney. Dr. Gedney observed that Plaintiff was pleasant and cooperative, and his social interactions were appropriate. Dr. Gedney noted that Plaintiff was having a hard time obtaining temporary jobs because he had a curfew until 6 a.m., and many jobs were filled by that time. Dr. Gedney also noted that Plaintiff mainly stayed to himself out of an effort not to violate his probation. Dr. Gedney observed that Plaintiff "appears

to have rather good judgement and insight. He is relatively intelligent and has capacity to learn new skills." Dr. Gedney opined that "functionally, the client has the capacity to secure and maintain gainful employment." He also recommended that because of his interpersonal challenges, employment efforts should be directed at positions emphasizing independence. (R. 305-08.)

Plaintiff had an initial interview with Helen Cadiz, Ph.D., and Jeff Everett, a licensed mental health counselor on January 31, 2012. He arrived early for his appointment, and stated he needed assistance because he felt uncomfortable in large crowds, and had employment difficulties because of the eighteen to nineteen years he spent in prison. It was noted that Plaintiff had recently completed an anger management program, and had now been clean for eight years. The providers opined "Both of these later factors seem to indicate he has sufficient motivation to continue to overcome barriers mentioned above to obtain gainful employment and to live as a productive member of society." (R. 292-93.) Plaintiff returned on February 14, 2012. He stated that he wanted to find employment because it would help him feel like he had a purpose. He described his mood as good. Plaintiff worked on his confidence in making good decisions, which would help him work with others. Part of his fear in working with others was coming into contact with people who would influence him to make bad decisions. (R. 293-94.)

Plaintiff had another appointment on February 28, 2012. He stated that he had been going to the employment office and helping his brother with painting. His thoughts were goal-directed. Plaintiff was maintaining a healthy outlook even though he had not

yet found a steady job, and he was making the best of the situation. (R. 295.) Plaintiff returned on March 14, 2012, after a scheduling error, about which he was "very understanding and cooperative." (R. 296.) On March 21, 2012, Plaintiff expressed that he was feeling frustrated about his job search. Plaintiff contrasted his previous lifestyle with the lifestyle that he wanted to live, and realized that he needed to change some of the behaviors he learned in prison. (R. 297.)

Plaintiff reported for therapy again on April 10, 2012, and reported that he came from a job that he had been working. He explained that he had been getting some day jobs, and he appeared in good spirits. The provider wrote that "it is clear that he feels better about his life when he has purpose which he exhibited today and as he indicated over the past week with more consistent work. This had also led Norman to slightly increase his social interactions albeit on a small level." (R. 298.)

Plaintiff's next appointment was on April 26, 2012. He came to the appointment straight from a job. He was cooperative and talkative. It was noted that his sense of well-being and self-esteem had improved, and he appeared to be enjoying increased interaction with his coworkers. (R. 299.) On May 9, 2012, Plaintiff stated that he could did not complain because he had been working pretty steadily. He was upbeat and engaged in the session. (R. 300.) On June 6, 2012, Plaintiff reported for therapy again stating that he could not complain because he had been getting work. (R. 301.)

On December 4, 2012, over a year after his August 13, 2011, consultative examination, Dr. Beaty filled out a mental residual functional capacity assessment form at the request of Plaintiff's counsel. Dr. Beaty opined that Plaintiff suffered from mild

limitations in the ability to remember locations and work-like procedures, and the ability to understand and remember short and simple instructions. He had moderate limitation in the ability to understand and remember detailed instructions. Dr. Beaty estimated that Plaintiff had mild limitations in the ability to carry out very short and simple instructions, moderate limitations in the ability to carry out detailed instructions, and marked limitations in the ability to maintain attention and concentration for extended periods.

Dr. Beaty said that Plaintiff had marked difficulties in the ability to perform activities within a schedule, and maintain regular attendance and be punctual within customary tolerance; moderate difficulties in the ability to sustain an ordinary routine without special supervision; marked difficulties in the ability to work in coordination with or proximity to others without being distracted by them; moderate difficulties in the ability to make simple work related decisions; and extreme difficulties in the ability to complete a normal workday without interruptions from psychologically based symptoms, and to perform at a consistent pace with a standard number and length of rest periods.

Dr. Beaty also concluded that Plaintiff had extreme difficulties in the ability to interact appropriately with the general public; moderate limitations in the ability to ask simple questions or request assistance; marked limitations in the ability to accept instructions and respond appropriately to criticism from supervisors; extreme limitations in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and marked limitation in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

Finally, Dr. Beaty opined that Plaintiff had marked limitations in the ability to respond appropriately to changes in the work setting; moderate limitations in the ability to be aware of normal hazards and take appropriate precautions; and marked difficulties in the ability to set realistic goals or make plans independently of others, and the ability to travel in unfamiliar places or use public transportation. (R. 302-304.)

**B. Hearing Testimony**

At the hearing before the ALJ, Plaintiff was fifty-three years old, and had completed high school. Plaintiff testified that he was getting jobs off and on with a labor pool, and had worked painting a fence as recently as the day before the hearing. Plaintiff also testified that he had been doing cleaning work, including sweeping and picking up trash. He stated that there were other people on the job site, but mainly he worked by himself. (R. 41-43.) Plaintiff stated that tomorrow he would go down to the labor pool again and look for a job. (R. 44.) Plaintiff testified that normally, his labor pool jobs lasted eight hours, and he generally worked three or four days out of the week, depending on where they sent him. (R. 51-52.)

Plaintiff testified that when he was in jail he had disciplinary actions against him for talking back to guards, and was generally in an open bay cell. Plaintiff stated that he had jobs in prison, including a job on the kitchen group, and he also attended vocational classes. He was responsible for jobs such as cleaning, including mopping and wiping the tables while in prison. (R. 43-44.)

The ALJ asked Plaintiff whether he thought he was not capable of doing a job where he worked by himself, such as being a nighttime janitor or a part of a lawn crew.

Plaintiff responded "[i]t's possible. Anything's possible." Plaintiff explained that his hesitation was because he had been on the job before and did not get along well with other guys on the site. He testified that one time he got so frustrated he had to be taken to the hospital, and he had a small heart attack, leaving his speech slurred. (R. 44-45.)

Plaintiff testified that he had been sleeping in his friend's vehicle that he borrowed, and he went to his sister's home to take showers, though he was not permitted to live there because of his attitude. If Plaintiff could not get a job with the labor pool, he would check in with his brother to try to get an odd job painting. (R. 45-47.)

Plaintiff had been visiting Vocational Rehabilitation, but had not been there recently because of his incarceration. Plaintiff was incarcerated for violating his curfew. (R. 47-48.) At Vocational Rehabilitation, Plaintiff saw a counselor named Jeff Everett. Plaintiff testified that he also completed an anger management class as part of his probation. (R. 50-51.)

Plaintiff stated that he slept very little at night, and he experienced some anxiety while incarcerated. Plaintiff testified that it was hard for him to communicate with other people. He explained that if he voiced his opinion regarding the best way to do something that others would think he was being dominant because of his physical size. He testified that he got "bent out of shape" a little bit because of his disagreements with others while working, but he was able to remain on the job sit and complete his tasks. Plaintiff testified that he did not think he had problems with supervisors. (R. 48-50.)

A vocational expert (VE) also testified at the hearing. The ALJ posed a hypothetical question to the VE, in which he asked the VE to assume an individual with moderate restrictions on carrying out detailed instructions or maintaining attention and concentration for periods of time, with marked limitations in the ability to perform a regular schedule and to work in coordination with others without being distracted. The individual had extreme limitations in being able to complete a normal work week and interacting with the general public, marked in being able to accept criticism from supervisors, extreme limitations in getting along with peers and coworkers without disturbing them, marked limitations in maintaining socially appropriate behavior, marked limitations in responding appropriately to changes in the work setting and to traveling in unfamiliar areas or to set realistic controls. The ALJ asked whether a claimant with those restrictions could be competitively employed. The VE testified the answer was no.

In the second hypothetical, the ALJ asked the VE to consider a person who could lift and carry twenty-five pounds frequently, fifty pounds occasionally, could sit, stand, and walk for eight hours in an eight-hour workday, can push and pull with his arms and feet, and should never climb ropes, ladders, and scaffolds, but could frequently climb ramps, stairs, and can frequently bend, balance, crouch, crawl, stoop, squat, and kneel. There were no limitations on the use of his hands, arms, and shoulder, and no known issues with his vision, hearing, or communication. He should avoid heights, and needs to do a job where he works with things, and not people. He could be around co-workers, but his work should be independent of coworkers. The

ALJ asked whether there were jobs for a person with such restrictions. The VE testified that such an individual could perform work such as laundry laborer, industrial cleaner, and housekeeper. This was a representative list, not an exhaustive one. (R. 53-56.)

**C. ALJ's Decision**

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the July 18, 2011 application date. Plaintiff had the severe impairments of: personality disorder and hypertension. Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings. (R. 21-23.)

The ALJ determined that Plaintiff had the RFC to perform medium work as defined in 20 CFR 416.967(c), with the following limitations: lifting and carrying twenty-five pounds frequently, and fifty pounds occasionally, can sit, stand, and/or walk up to eight hours in an eight hour workday, can push and pull with his arms and feet, must never climb ropes, ladders, and scaffolds, but can frequently climb ramps and stairs, can frequently bend, balance, crawl, crouch, stoop, squat, and kneel, unlimited in his use of hands, arms, and shoulders, no known issues with his vision, hearing, or communication, and should avoid heights. He needs to do a job where he works with things and not people, and may do work that is in the proximity of the public or co-workers, but should do a job that is independent of the public and co-workers. In making this determination, the ALJ partially credited Plaintiff's complaints regarding the effects of his medically determinable impairments, but found that Plaintiff's complaints were not fully credible. (R. 23-27.)

The ALJ found Plaintiff had no past relevant work, and he was an individual

closely approaching advanced age on the date the application was filed. Plaintiff had a high school diploma. The ALJ determined that considering his age, education, work experience, and RFC, there were jobs that existed in the national economy that he could perform, such as laundry laborer, industrial cleaner, and housekeeper. Accordingly, the ALJ concluded that Plaintiff was not disabled. (R. 27-29.)

## IV. DISCUSSION

Plaintiff raises one issue in this appeal: whether the ALJ erred by failing to give "great weight" to the opinion of consulting psychologist Dr. Beaty, "regarding Plaintiff Hayes 3 extreme limitations and 9 marked limitations in job performance arising out of Plaintiff'‘s Hayes' mental health problems." Doc. 11.

The ALJ specifically discussed both Dr. Beaty's consultative examination record and also his mental residual capacity form, and explained in detail why he gave Dr. Beaty's opinion "little weight." The ALJ concluded that Dr. Beaty's assessment was contrary to the treatment records of Dr. Cadiz and Mr. Everett, to which the ALJ assigned "significant consideration," because of the length of time they treated Plaintiff. The ALJ also found that Dr. Beaty's opinion was contrary to the opinion of Dr. Gedney, who treated Plaintiff for vocational rehabilitation, to which the ALJ assigned "significant probative weight."

A review of Plaintiff's records supports the conclusion that Dr. Beaty's checklist assessment—in which he checked boxes indicating marked and extreme limitations in several functional areas—is at odds with Plaintiff's treatment notes, and is not supported by the results of Dr. Beaty's own consultative examination. For example,

Plaintiff's treatment records all state that Plaintiff was early, on time, and punctual for his appointments, despite Dr. Beaty's opinion that Plaintiff had marked difficulties in the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.

In assessing Plaintiff's ability to do work-related tasks, Dr. Beaty found in his August 13, 2011 report of the consultative examination that Plaintiff's ability "traveling - all ok" but his checklist assessment in stark contrast notes marked difficulties in the ability to travel in unfamiliar places or use public transportation.

Dr. Beaty also noted in the checklist assessment that Plaintiff would have extreme difficulties in the ability to complete a normal workday without interruptions from psychologically based symptoms. This finding is directly contrary to Dr. Cadiz and Mr. Everertt's notes. These progress notes show that Plaintiff was reporting for therapy after working, that Plaintiff was showing improvement in his ability to get along with others, and that he was enjoying increased interaction with coworkers. (R. 299.)

More importantly, the severe degree of limitation noted by Dr. Beaty in the December 4, 2012 checklist assessment has no support in Dr. Beaty's notes from the consultative examination, which was conducted more than a year *before* Dr. Beaty filled-out the checklist assessment. These notes reflect that in his August 13, 2011 consultative examination of Plaintiff, Dr. Beaty found that Plaintiff had intact organized thought process; normal thought content; no significant deficits in his ability to do work-related tasks including understanding, speaking, and task persistence; and although Plaintiff was somewhat distant, he had socially appropriate interactions, appropriate

responses to questions, and good eye contact. (R. 290-91.) Notably, there is no evidence that Dr. Beaty examined Plaintiff after the consultative examination or that Dr. Beaty did anything to determine the condition of Plaintiff when he filled-out the checklist assessment form. And in contrast to Dr. Beaty's checklist assessment the progress notes and findings from Dr. Cadiz and therapist Everett are based upon their treatment history with Plaintiff. Consequently, as the ALJ found, Dr. Beaty's checklist assessment is of limited value.

Given that the ALJ had the benefit of the relevant treatment notes from Plaintiff's providers, which covered a longitudinal treatment period, and that Dr. Beaty's checklist assessment is inconsistent with his own examination notes and Plaintiff's other treatment records, the Court has no difficulty in concluding that the ALJ did not err by giving Dr. Beaty's opinion "little weight."

Accordingly, the Court concludes that substantial evidence supports the ALJ's finding that Plaintiff could perform work as a laundry laborer, industrial cleaner, and housekeeper and was not disabled within the meaning of the Social Security Act.

## V. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS,** in Gainesville, Florida, on the 13th day of February 2015.

s/ Gary R. Jones
GARY R. JONES
United States Magistrate Judge

**NOTICE TO THE PARTIES**

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**